IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

WELLS REAL ESTATE INVESTMENT
TRUST II, INC.,

        Plaintiff

           v.

CHARDON/HATO REY PARTNERSHIP,
S.E.,

        Defendant

CIVIL NO. 08-1613 (JP)

## OPINION AND ORDER

Before the Court is a motion for summary judgment (No. 117) filed by Plaintiff Wells Real Estate Investment Trust II, Inc. ("Wells"), and Defendant Chardón/Hato Rey Partnership, S.E.'s ("Chardón/Hato Rey") opposition thereto (No. 136). Also before the Court is a motion for partial summary judgment filed by Defendant (No. 131), along with Plaintiff's opposition thereto (No. 134). Plaintiff filed the instant lawsuit premised on diversity jurisdiction pursuant to P.R. Laws Ann. tit. 31, §§ 2294, 3018, and 3052, for Defendant's alleged breach of contract in the sale of real property. For the reasons stated herein, Plaintiff's motion for summary judgment (**No. 117**) is hereby **DENIED,** and Defendant's motion for summary judgment (**No. 131**) is hereby **GRANTED.** Also pending before the Court is Defendant's counterclaim, which will be decided herein.

CIVIL NO. 08-1613 (JP)          -2-

I.    **FACTUAL BACKGROUND**[1]

      This action arose out of a January 25, 2008, Purchase and Sale Agreement (the "Agreement") between the parties hereto for the sale of the American International Group Plaza building, located at 250 Muñoz Rivera Avenue, San Juan, Puerto Rico (the "Property"). Under the terms of the aforesaid Agreement, Plaintiff delivered $4,000,000.00 in escrow deposits to First American Title Company (the "Escrow Agent"), with the expectation of paying the outstanding $76,000,000.00 balance at the closing.  Said closing was originally scheduled to take place on February 12, 2008, but was later rescheduled by Defendant to March 14, 2008.

      On February 12, 2008, a diesel fuel spill occurred in the Property prior to its ownership transfer, thereby causing serious damage and requiring all tenants to vacate the Property.  Over 1,200 gallons of diesel fuel spilled into the top floor mechanical room of the Property, and then seeped down various utility shafts and electrical ducts which service all tenant levels of the Property. Defendant initiated the cleaning and restoration work at the Property.  By the end of March, 2008, the Property had been cleared for re-occupancy by the appropriate government entities. All tenants returned to the Property by June 9, 2008.

---

1.    The Court derives the following factual summary from the parties' motions, statements of material facts, and exhibits.  Nos. 117, 131, 134, 136.

CIVIL NO. 08-1613 (JP)          -3-

Plaintiff did not appear at the closing that Defendant had scheduled for March 14, 2008.  Instead, Plaintiff has brought this lawsuit to recover its escrow deposit.  Plaintiff relies on Section 6.2.1 of the Agreement, which states that Plaintiff is entitled to recover his escrow deposit if there is material damage to the Property in an amount exceeding $4,000,000.00 to repair in Defendant's reasonable estimation.  Plaintiff also alleges that Defendant failed to provide Plaintiff with the required Tenant Estoppel Certificates pursuant to Section 7.3.7 of the Agreement. On June 2, 2008, Plaintiff filed the Complaint in this action.

## II.  <u>MATERIAL FACTS NOT IN GENUINE ISSUE OR DISPUTE</u>

The following material facts were deemed uncontested by all parties hereto at the October 14, 2008, Initial Scheduling Conference (Nos. 33 and 40).

1.  Plaintiff Wells Real Estate Investment Trust II, Inc. ("Wells") and Defendant Chardón/Hato Rey Partnership, S.E. ("Chardón/Hato Rey"), entered into a Purchase and Sale Agreement, governed by the laws of Puerto Rico and dated January 25, 2008 (the "Agreement").

2.  Pursuant to the Agreement, and subject to the terms and conditions set forth therein, Chardón/Hato Rey agreed to sell to Wells, and Wells agreed to purchase the property described in Article 2 of the Agreement (the "Property"), which Property included a commercial office building known

CIVIL NO. 08-1613 (JP)            -4-

as the American International Plaza, located at 250 Muñoz
Rivera Avenue, in San Juan, Puerto Rico.

3.    Pursuant to Article 3 of the Agreement, on or before
January 28, 2008, Wells delivered an Initial Deposit of
$2,000,000.00 and an Additional Deposit of $2,000,000.00,
for the total sum of $4,000,000.00 (the "Deposits"), to
First American Title Insurance Company, as Escrow Agent
(the "Escrow Agent").

4.    During the period from January 25, 2008, to February 12,
2008, Wells did not communicate to Chardón/Hato Rey any
concerns about a potential or actual breach of
Section 6.1.3 of the Agreement.

5.    On February 6, 2008 Chardón/Hato Rey notified Wells in
writing that in accordance with Sections 12.10
and 1.1.11(a) of the Agreement Chardón/Hato Rey was
exercising its option to postpone the closing date for up
to thirty-one calendar days, and that Chardón/Hato Rey
would notify Wells of the new closing date at least three
Business Days prior to such new closing date.  A copy of
the February 6, 2008 letter was produced as C/HR-000455 to
C/HR-000456.

6.    A spill of diesel fuel (the "Fuel Spill") occurred at the
Property on or about February 12, 2008.

CIVIL NO. 08-1613 (JP)            -5-

7.   Chardón/Hato Rey undertook repair of the Property upon becoming aware of the Fuel Spill.

8.   On February 15, 2008, Chardón/Hato Rey provided Wells with the letter produced as C/HR-000460 to C/HR-000462.

9.   The February 15, 2008 letter produced as C/HR-000460 to C/HR-000462, Chardón/Hato Rey, citing Section 6.2.2 of the Agreement, designated experts.

10.  Wells denied Chardón/Hato Rey's designation of experts.

11.  On February 21, 2008, Wells sent Chardón/Hato Rey the letter produced as C/HR-000464 to C/HR-000465.

12.  On March 10, 2008, counsel for Chardón/Hato Rey sent to Wells the letter produced as C/HR-000585 to C/HR-000586.

13.  Counsel for Wells responded via letter dated March 11, 2008, produced as C/HR-000588 to C/HR-000589.

14.  The reply from counsel for Chardón/Hato Rey was contained in a letter dated March 11, 2008, produced as C/HR-000592 to C/HR-000593.

15.  On March 13, 2008, counsel for Chardón/Hato Rey wrote the letter produced as C/HR-000600 to C/HR-000602 to the Escrow Agent.

16.  Counsel for Wells wrote to the Escrow Agent on March 13, 2008, a copy of which letter was produced as C/HR-000606 to C/HR-000607.

CIVIL NO. 08-1613 (JP)          -6-

17.  Counsel for Chardón/Hato Rey wrote a follow up letter to the Escrow Agent on March 13, 2008, a copy of which was produced as C/HR-000613 to C/HR-000614.

18.  Counsel for Wells wrote to counsel for Chardón/Hato Rey on March 13, 2008, a copy of which communication was produced as C/HR-000608 to C/HR-000609.

19.  Counsel for Chardón/Hato Rey responded to the communication from Wells' counsel via letter also dated March 13, 2008, produced as C/HR-000618 to C/HR-000619.

20.  On March 14, 2008, Chardón/Hato Rey sent a letter to the Escrow Agent, a copy of which was produced as C/HR-000603 to C/HR-000604.

21.  On March 14, 2008, Chardón/Hato Rey sent a letter to the Escrow Agent, a copy of which was produced as C/HR-000622 to C/HR-000623.

22.  On March 14, 2008, Wells notified the Escrow Agent that it disputed Chardón/Hato Rey's entitlement to the Deposits.

23.  On March 14, 2008, the Escrow Agent notified both Wells and Chardón/Hato Rey that it had received conflicting demands for the Deposits and that it would "continue to hold the funds pending a resolution of the dispute and joint authorization to disburse the funds."

CIVIL NO. 08-1613 (JP)          -7-

     24.  Defendant received a letter from Wells dated March 17, 2008, objecting to Chardón/Hato Rey's previously submitted estimate.

     25.  On June 2, 2008, Plaintiff filed the Complaint in this action.

     26.  On July 24, 2008, the Defendant filed its Answer and counterclaim in this action.

The following facts are deemed uncontested by the Court because they were included in the motions for summary judgment and oppositions and were agreed upon, or they were properly supported by evidence and not genuinely opposed.  Given the large number of facts filed by the parties, the Court emphasizes that it only includes facts deemed to be material and non-repetitive in this section.[2]

     1.  The purchase price of the Property under the Agreement was $80,000,000.00.

     2.  On or around February 10, 2008, the transformer at the Property failed, and the Property's two emergency generators began operating.

---

[2]  The United States Court of Appeals for the First Circuit has held that "it is a bedrock principle that federal trial courts possess wide-ranging authority to manage the conduct of litigation."  Martinez-Serrano v. Quality Health Servs., 2009 U.S. App. LEXIS 12302 (1st Cir. P.R. June 8, 2009) (Selya, C.J.). Accordingly, when the parties file over three hundred proposed uncontested facts, it is well within the Court's discretion to consider only those facts which bear directly on the issues before it.

CIVIL NO. 08-1613 (JP)          -8-

3.   As a result of the Fuel Spill on February 12, 2008, about 1,200 gallons of diesel fuel were released from the Maintenance Room on the top floor of the building.

4.   All tenants were vacated from the Property after the Fuel Spill.

5.   Section 6.2 of the Agreement, titled "Damage" states that "If prior to Closing, the Property is damaged by fire or other casualty, [Defendant] shall estimate the cost to repair and the time required to complete repairs and will provide [Plaintiff] written notice of [Defendant's] estimation as soon as reasonably possible after the occurrence of the casualty."

6.   The Agreement defines "Material Damage" as "damage which, in [Defendant's] reasonable estimation, exceeds $4,000,000.00 to repair."

7.   Pursuant to § 1.1.11 of the Agreement, the Closing was to take place on February 12, 2008.

8.   On or around February 4, 2008, Defendant sent fifteen estoppel certificates by electronic correspondence and by overnight mail to Plaintiff.

9.   On February 6, 2008, Defendant notified Plaintiff in writing that in accordance with §§ 12.10 and 1.1.11(a) of the Agreement, Defendant was exercising its option to postpone the closing date for up to thirty-one calendar

CIVIL NO. 08-1613 (JP)            -9-

    days, and that Defendant would notify Wells of the new closing date at least three business days prior to such new closing date.

10. On February 11, 2008, the parties had a telephone conversation to discuss issues arising under the tenant estoppels delivered to Plaintiff by Defendant.

11. On February 15, 2008, Defendant provided to Plaintiff an initial estimate of $650,000.00 in repair costs.

12. On March 3, 2008, Plaintiff sent a letter to Defendant demanding "new and satisfactory estoppel letters from all Property Tenants."

13. On March 6, 2008, Defendant provided Plaintiff with a revised estimate of $2,546,509.00 in repair costs.

14. On March 11, 2008, Plaintiff sent Defendant a letter indicating that Plaintiff had "not received estoppel certificates which meet the requirements of Section 7.3.7" of the Agreement, and "have not received new estoppel certificates since the fuel spill occurred, despite [Plaintiff's] demand for the same."

15. In a letter from Plaintiff to Defendant dated March 17, 2008, Plaintiff states that it believed Defendants' estimate was wrong because "significant work [was] not included." Plaintiff also provided its own estimate of

CIVIL NO. 08-1613 (JP)          -10-

   damages based on the cost of the additional work needed, all of which was related to repairs of the building.

16. By March 25, 2008, Defendant had obtained all clearances from governmental authorities needed to re-open the Property on March 26, 2008.

17. In a letter from Plaintiff to Defendant dated April 1, 2008, Plaintiff asserted that Defendant's alleged costs to repair of approximately $3,000,000.00 continued to be understated because "more work" was needed.

18. In the same letter, Plaintiff requested permission to inspect the Property and the work that had been done to better understand the scope of Defendant's repairs and remediation work.

19. Defendant abated the tenants' rent from February 1, 2008, to April 15, 2008.  A portion of said abatements was required under the leases, and another portion was not required.

20. Defendant also provided tenants the equivalent of sixty days' rent in the form of an allowance to be used for tenant improvements at the Property.  Of this amount, twenty five percent could be used for personal property needs.

21. On April 23, 2008, Plaintiff's Board of Directors followed its advisor's recommendation and decided not to proceed

CIVIL NO. 08-1613 (JP)          -11-

> with the purchase of the Property based on their belief that "as result of the diesel fuel spill, the Property has sustained significant value diminution as a result of current and prospective tenant perceptions and that the building may never be restored to a Class A condition due to a potential on-going air quality issues."

22.  Over ninety-five percent of all leased space was re-occupied by the tenants by the end of May, 2008.

23.  The last tenant to return did so on June 9, 2008.

## III.  LEGAL STANDARD FOR A MOTION FOR SUMMARY JUDGMENT

Summary judgment serves to assess the proof to determine if there is a genuine need for trial. Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990). Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the record, including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, viewed in the light most favorable to the nonmoving party, reveals no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Zambrana-Marrero v. Suárez-Cruz, 172 F.3d 122, 125 (1st Cir. 1999) (stating that summary judgment is appropriate when, after evaluating the record in the light most favorable to the non-moving party, the evidence "fails to yield a trial worthy issue as to some material fact"); Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116

CIVIL NO. 08-1613 (JP)          -12-

(1st Cir. 1993); <u>Canal Ins. Co. v. Benner</u>, 980 F.2d 23, 25 (1st Cir. 1992). The Supreme Court has stated that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). In this way, a fact is material if, based on the substantive law at issue, it might affect the outcome of the case. See <u>Mack v. Great Atl. and Pac. Tea Co., Inc.</u>, 871 F.2d 179, 181 (1st Cir. 1989).

On a summary judgment motion, the movant bears the burden of "informing the district court of the basis for its motion and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once the movant meets this burden, the burden shifts to the opposing party who may not rest upon mere allegations or denials of the pleadings, but must affirmatively show, through the filing of supporting affidavits or otherwise, that there is a genuine issue of material fact for trial. See <u>Anderson</u>, 477 U.S. at 248; <u>Celotex</u>, 477 U.S. at 324; <u>Goldman</u>, 985 F.2d at 1116.

**IV. <u>ANALYSIS</u>**

Plaintiff argues that summary judgment should be granted on its behalf on the following grounds: (1) Defendant's estimate of the repair costs was not reasonable because it failed to include losses

CIVIL NO. 08-1613 (JP)              -13-

under the leases, (2) Defendant failed to satisfy a condition precedent under the Agreement because it did not deliver the tenant estoppel certificates required by the Agreement (the "Required Estoppels"), (3) Plaintiff may rescind the Agreement because Defendant failed to provide the requisite tenant estoppel certificates, and (4) Plaintiff did not waive its right to recover its deposit and it had no obligation to formally terminate the Agreement.

Defendant moves for summary judgment on the following grounds: (1) repair costs do not include lost lease income, and therefore, as a matter of law, Plaintiff cannot recover its deposit, (2) Defendant has complied with its obligations regarding the Required Estoppels, and (3) Defendant complied with its maintenance obligations. Because the parties' arguments involve many of the same issues, the Court will consider their motions together.

## A.  **Repair Costs**

The parties have stipulated that pursuant to Section 6.2.1 of the Agreement, Plaintiff is entitled to terminate its obligation to purchase the Property and receive a refund of its deposit if the Fuel Spill caused "Material Damage to or destruction of the Property." It is also uncontested that Section 6.2.1 of the Agreement defines Material Damage as "damage which, in [Defendant's] reasonable estimation, exceeds $4,000,000.00 to repair." The question posed by Plaintiff, in an example of its counsel's thorough and innovative

CIVIL NO. 08-1613 (JP)          -14-

litigation technique, is whether damage to the tenant leases, in the form of lost income or other monetary losses, is included in the calculation of Material Damage.

On March 6, 2008, Defendant provided a revised estimate of repair costs totaling $2,546,509.00. According to Defendant's expert witness, the actual repair costs amounted to $3,606,407.00. Both of these numbers are below the $4,000,000.00 mark, and therefore would not permit Plaintiff to recover its deposit. However, Plaintiff argues that included in this figure should be the rent abatement for the tenants' leases during the time they vacated the Property, which totals $1,507,902.00. Plaintiff also argues that the Court must consider costs in the amount of $1,268,992.34, which were incurred for tenant benefits, such as (1) sixty days rent for tenant improvements for each tenant, (2) a $1,000.00 credit for each employee who facilitated a tenant's move to a temporary location, (3) a $50.00 credit for each employee to be used for a tenant event, (4) flowers and breakfast upon the tenants' return to the Property, and (5) one dinner package worth $250.00 for each tenant.

Article 1233 of the Puerto Rico Civil Code determines the manner in which courts should interpret contracts in dispute as to the meaning of their terms. P.R. Laws Ann. tit. 31, § 3471; see Hopgood v. Merrill Lynch, Pierce, Fenner & Smith, 839 F. Supp. 98, 104 (D.P.R. 1993) (Pieras, J.). Article 1233 is strict in its mandate that a court should enforce the literal sense of a written contract,

CIVIL NO. 08-1613 (JP)          -15-

unless the words are somehow contrary to the intent of the parties. Hopgood, 839 F. Supp. at 104, citing Marina Ind. Inc. v. Brown Boveri Corp., 114 D.P.R. 64, 72 (1983). For Article 1233 purposes, a term is considered "clear" when it is sufficiently lucid to be understood to have one particular meaning, without room for doubt. Hopgood, 839 F. Supp. at 104, internal citations omitted. Once a court concludes that the terms of a contract are sufficiently clear so that only one meaning is possible, the court cannot dwell on the "alleged" intent of the parties at the moment they entered into the contract. Id.

     The First Circuit has held that when the words of a contract are so clear that reasonable people could not differ over their meaning, then the judge must decide the issue himself as a matter of law. Boston Five Cents Sav. Bank v. Secretary of Dep't of Housing & Urban Dev., 768 F.2d 5, 8 (1st Cir. 1985) (citing 3 Corbin on Contracts § 554 (1960)). The First Circuit stated that "[e]ven if there is ambiguity in the language, however, the evidence presented about the parties' intended meaning may be so one-sided that no reasonable person could decide the contrary." Boston Five Cents Sav. Bank, 768 F.2d at 5. Therefore, the Court must now decide whether the evidence so clearly supports one interpretation that no reasonable person could differ about what the contract means, either because the language is unambiguous or because the supporting evidence is sufficiently one-sided. Id.

CIVIL NO. 08-1613 (JP)            -16-

The Court finds that the terms of this contract – defining material damage in terms of repair costs –  are so clear that this issue can be resolved as a matter of law by the Court.  Given the specific "repair" language used by the parties, the Court finds that this term unambiguously refers to physical damage.  The word repair does not make sense in the context of losses under the tenant leases. If the parties had intended for lost lease income to be included in this figure, the Court is certain that the terminology would have been phrased differently, perhaps referring to a numerical amount in "costs or losses" or something to that effect.

Although lack of ambiguity in the contract language is so apparent that the Court could end its analysis here, the Court will nonetheless briefly touch upon the evidence presented regarding the parties' intended meaning.  Along those lines, Article 1234 of the Puerto Rico Civil Code states that "[i]n order to judge as to the intention of the contracting parties, attention must principally be paid to their acts, contemporaneous and subsequent to the contract." P.R. Laws Ann. tit. 31, § 3472.

In Section 6.2.2 of the Agreement, the parties state that in the event of a dispute about the estimated costs to repair, the parties would refer the dispute to an architect or engineer.  These are two categories of experts who could provide a valuation of physical damage.  Their expertise is not related to calculating lost rent income or the payment of tenant benefits.

CIVIL NO. 08-1613 (JP)          -17-

The Court is not persuaded by Plaintiff's argument that because the parties defined the term "Property" in § 2.1 of the Agreement to include tenant leases, repair costs should also include loss of lease income.  In response to said argument, Defendant points to several instances in the Agreement where the terms "Property" and "leases" are used separately, including Sections 4.2 and 4.8.  Also, Defendant informed the Court that it provided Plaintiff with a copy of the leases prior to the signing of the agreement.  The leases provide that, in the event of a casualty, if the premises are unfit for occupancy, the landlord shall abate the tenants' rent during the time the premises are unfit for occupancy.  As such, Plaintiff already knew that the Property would not generate rent in the occurrence of a casualty such as the Fuel Spill, and therefore this factor would not have been contemplated by the parties in drafting the section of the Agreement regarding repair costs.

Having found that the cost of repair is limited to the repair of the physical structure, the Court also necessarily finds that Defendant has provided Plaintiff with a reasonable estimation of said cost in compliance with Section 6.2.1 of the Agreement.  Accordingly, the Court agrees with Defendant that as a matter of law, the costs of repairs is limited to the physical structure of the Property.  Thus, the Court **DENIES** Plaintiff's motion for summary judgment and **GRANTS** Defendant's motion for summary judgment on this issue.

CIVIL NO. 08-1613 (JP)          -18-

    B.   **Estoppel Certificates**

    Section 7.3.7 of the Agreement provides that it was a "condition to [Plaintiff's] obligation to close . . . that the Required Estoppels, do not . . . reflect any material discrepancies of the terms of the Leases . . . that are materially adverse to the landlord thereunder . . ." The purpose of the Required Estoppels is to allow Plaintiff to properly value its investment based on the security and income derived from the Property's leases. The Required Estoppels include estoppels executed by tenants who, when aggregated, account for seventy-five percent of the total leasable space. On February 6, 2008, Defendant provided fifteen estoppel certificates to Plaintiff. Plaintiff argues that these estoppel certificates contain material defects. As such, Plaintiff argues that it is entitled to the entry of summary judgment on its behalf because Defendant failed to satisfy a key condition precedent to the Plaintiff's obligation to close under the Agreement: namely, the production of the Required Estoppels. Plaintiff also argues that it is entitled to rescission of the contract given that Defendant failed to comply with its obligation to deliver the Required Estoppels. The Court will consider these two arguments in turn.

    Plaintiff first argues that Defendant's delivery of the Required Estoppels was a condition precedent to the closing of the Property. "A condition precedent is an act which must occur before performance by the other party is due." <u>Hope Furnace Assocs. v. FDIC</u>,

CIVIL NO. 08-1613 (JP)        -19-

71 F.3d 39, 43 (1st Cir. 1995) (quoting <u>Wood v. Roy Lapidus, Inc.,</u> 10 Mass. App. Ct. 761, 763 n.5 (1980)).  This Court has held that a conditional obligation does not bind a party until the specified condition occurs.  <u>WHTV Broad. Corp. v. Centennial Communs. Corp.,</u> 460 F. Supp. 2d 297, 304 (D.P.R. 2006).  The Supreme Court of Puerto Rico has stated that while the condition precedent is pending, it can be said that the obligation does not exist.  <u>Meléndez Martínez v. Jiménez Realty, Inc.,</u> 98 D.P.R. 892, 897 (1970).

There is no dispute that Defendant provided Plaintiff with fifteen estoppel certificates prior to closing, amounting to over seventy-five percent of the total leasable space.  The dispute arises over whether the estoppels provided by Defendant reflect any material discrepancies with the terms of the tenants' leases.  The issues raised by Plaintiff are as follows: (1) the Goldman Antonetti & Córdova ("Goldman") estoppel alleged overpayment of rent due to a miscalculation in the square footage contained in the lease, (2) the UBS estoppel asserted that the cost of certain tenant improvements promised by Defendant under the lease had not yet been paid to UBS, (3) the Charles Schwab estoppel disclosed an outstanding demise allowance owed by Defendant, (4) the KPMG estoppel struck the language warranting that there were no bankruptcy proceedings pending against KPMG, (5) the Barreto & Vélez estoppel revealed a different expiration date from the one listed in the lease provided to Plaintiff, and (6) the Educational Testing Service ("ETS") estoppel

CIVIL NO. 08-1613 (JP)          -20-

revealed a discrepancy in the square footage of the lease. Plaintiff alleges that it requested that Defendant provide "clean" estoppels on five separate occasions between February 11, 2008, and March 12, 2008.

In response, Defendant argues that the issues raised by Plaintiff were immaterial and inconsequential. Moreover, the parties discussed the issues raised by Plaintiff in a telephone call on February 11, 2008, whereby Defendant specifically responded to the issues raised by Plaintiff. First, the Goldman issue arose out of a handwritten note by Robert Montalvo ("Montalvo"), Goldman's managing shareholder, regarding the square footage of the leased space. In said note, Montalvo stated that Goldman is "studying the issue" as "it understands" the rental payment should be computed based on the square footage stated in the original lease and not based on the second amendment of August 2003. The Court notes that Goldman did not cross out the amount of square feet printed in the certificate. Goldman's original lease stipulated that the landlord could re-measure the space at any time, and that on Goldman's behalf, Montalvo had signed a lease amendment with the correct square footage when the building was re-measured. Goldman had been paying rent based on the revised square footage since August 2003. Defendant also provided Plaintiff with the documents necessary for it to verify that Goldman was paying rent based on the correct square footage.

CIVIL NO. 08-1613 (JP)          -21-

As to the UBS and Charles Schwab estoppels, Defendant agreed to credit the amounts in dispute to Plaintiff at the closing and informed Plaintiff of the same over the telephone and in the closing statements.  In the KPMG estoppel, KPMG struck the language related to bankruptcy proceedings due to a national corporate instruction to always strike that kind of language in its estoppel certificates. In Exhibit G to the Agreement, Plaintiff agreed that the information on line fifteen of the estoppels (the line stricken by KPMG) is not material or substantial to the Agreement.

Defendant explained that the final two estoppels contained typographical errors.  The lease expiration date on item eight of the estoppel certificate for Barreto & Vélez was mistakenly written as 2013 instead of 2012.  The error was subsequently corrected by hand and initialed by the tenant.  The ETS certificate stated that the lease consisted of 3,205 square feet instead of 3,025 square feet.  This error was also corrected.  Defendants argue that even if these errors had not been corrected, Defendant would still have complied with Section 7.3.7 of the Agreement because it delivered estoppel certificates covering seventy-five percent of the leasable space.

The First Circuit has held that materiality, although largely a matter of applying a legal standard to particular facts, is one of those "mixed" questions that is ordinarily left to the trier of fact unless the outcome is so clear that a reasonable jury could decide

CIVIL NO. 08-1613 (JP)          -22-

it only one way.  Grande v. St. Paul Fire & Marine Ins. Co.,
436 F.3d 277, 283 (1st Cir. 2006).  In this case, the Court finds
that the outcome can be resolved as a matter of law, given that it
is clear that Defendant fully complied with the requirements of
Section 7.3.7 of the Agreement.  Defendant delivered fifteen estoppel
certificates to Plaintiff before the closing.  The issues raised by
Plaintiff do not constitute "material discrepancies," especially
since Defendant has cured or explained all those listed by Plaintiff
in its brief.  Given that no reasonable jury could find that
Defendant failed to provide the Required Estoppels, the Court finds
as a matter of law that Defendant has complied with Section 7.3.7 of
the Agreement.  Having found that Defendant complied with its
obligation regarding the Required Estoppels, the Court also finds as
a matter of law that Plaintiff is not entitled to rescission of the
Agreement.

     Moreover, Plaintiff waived its right to contest the tenant
estoppel certificates.  Pursuant to Section 7.3.7(c) of the
Agreement, Plaintiff had two options if Defendant failed to provide
the Required Estoppels: (1) waive the requirement for estoppel
certificates and proceed to closing, or (2) terminate the Agreement
by immediate notification to Defendant.  Section 12.10 of the
Agreement requires notification to be in writing, sent through U.S.
Mail with return receipt requested, by overnight delivery via a

CIVIL NO. 08-1613 (JP)              -23-

courier, by personal delivery, or by facsimile during normal business hours.  No electronic notification was permitted.

Although Plaintiff raised several issues regarding the estoppel certificates, as discussed above, it is clear from the evidence before the Court that Plaintiff did not provide immediate notification to Defendant of its intention to terminate the Agreement upon receiving the estoppel certificates provided by Defendant. Further, Plaintiff's reliance on Section 10.2 of the Agreement is misplaced, given that Section 7.3.7 provides a more specific guideline for Plaintiff's termination obligation pursuant to an issue with the estoppel certificates.  See Lawson v. FDIC, 3 F.3d 11, 17 (1st Cir. 1993) (stating that "it is a familiar precept of contract interpretation that the specific controls the general . . .").

Therefore, the Court **DENIES** Plaintiff's motion for summary judgment and **GRANTS** Defendant's motion for summary judgment as to the issue of the Required Estoppels.

### C.   Maintenance Obligations

The final issue raised by Defendant in its motion for summary judgment is its compliance with the maintenance obligations imposed upon it by the Agreement.  Defendant argues that Plaintiff's breach of contract claim based on Section 6.1.3 of the Agreement should be denied as a matter of law.

Section 6.1.3 provides as follows:

CIVIL NO. 08-1613 (JP)            -24-

> Subject to Sections 6.2 and 6.3, [Defendant] shall maintain or cause the tenants under the Leases to maintain (to the extent provided in such Leases) all Improvements substantially in their present condition (ordinary wear and tear and casualty excepted) and in a manner consistent with [Defendant's] maintenance of the Improvements during [Defendant's] period of ownership. [Defendant] will not remove any Tangible Personal Property except as may be required for necessary repair or replacement.

Essentially, Defendant was required to maintain the premises in the same condition from the signing of the Agreement until the date of the closing.

In its complaint, Plaintiff alleges that Defendant failed to comply with Section 6.1.3 of the Agreement because it failed to provide Plaintiff with adequate assurances that it had maintained the equipment which caused the fuel spill, and that Defendant also failed to produce maintenance records or other documentation regarding the cause of the spill.  In response, Defendant argues that Plaintiff agreed to buy the property "as is" at the time of closing, and that Defendant has proffered enough evidence to demonstrate that it complied with its maintenance obligations under the Agreement.

The Court finds that the "as is" language contained in Section 11.2 of the Agreement does not relieve Defendant of its specific maintenance obligations under Section 6.1.3.  See Lawson, 3 F.3d at 17.  However, the Court also finds that Defendant has proffered sufficient evidence to demonstrate that no question of fact exists as to whether Defendant complied with its maintenance

CIVIL NO. 08-1613 (JP)          -25-

obligations between the period of January 25, 2008, to February 12, 2008.

     It is uncontested that Plaintiff's representatives toured the Property and found it to be structurally fit for purchase on or before January 25, 2008.  The language in Section 6.1.3 requires Defendant to maintain the Property in this same condition during the period of time between the signing of the Agreement and the closing. The Court notes that the language of Section 6.1.3, as drafted, specifically exempts casualties from this Section.  The Court understands this Section to generally require Defendant to refrain from engaging in any negligent behavior that could damage the property during the time the sale was pending.

     On February 11, 2008, Antonio Suárez, sales representative for RIMCO, the authorized Caterpillar dealer in Puerto Rico, and Israel Ortiz ("Ortiz"), Building Engineer for Defendant, agreed to continue the annual maintenance service agreement for the generators at the same level of maintenance (level II) as the prior year.  Level II is the most complete maintenance service offered by RIMCO.  A level II maintenance was performed on November 26, 2007, and the next scheduled level II maintenance was to be performed in May, 2008.

     On February 10, 2008, the transformers at the Property failed. On February 11, 2008, Ortiz requested that RIMCO provide a full inspection of the generators.  RIMCO inspected the generators on that same day.  RIMCO informed Ortiz that a full level II maintenance was

CIVIL NO. 08-1613 (JP)          -26-

not necessary at that time, since the generators did not require changing the oil and filter for two hundred fifty hours of running time.  RIMCO inspected the generators pursuant to the level I maintenance checklist.  RIMCO also inspected the gauges, security indicators, and the clocks of the generators as part of their visual inspection.  RIMCO found the generators to be in good operating condition.

Immediately after the fuel spill occurred, Defendant called RIMCO to return for an inspection.  The RIMCO technician found that the control panel was tripped and proceeded to re-set it.  Defendant requested RIMCO to change the control panel as a preventative measure.  Again, the RIMCO technician stated that the generators were in good operating condition immediately before and after the diesel spill.

The Court finds that Defendant has proffered significant evidence demonstrating that it complied with its maintenance obligations under Section 6.1.3.  The mere occurrence of the Fuel Spill does not alone demonstrate that Defendant was negligent in maintaining the Property. See Alberto O. Bacó v. Almacén Ramón Rosa Delgado Inc., 151 P.R. Dec. 711 (June 30, 2000) (rejecting the theory of *res ipsa loquitor* as a basis for recovery in actions for negligence under Puerto Rico law).  Moreover, the Agreement itself exempts casualties from Defendant's maintenance obligation.  Accordingly, the Court **GRANTS** Defendant's motion for summary

CIVIL NO. 08-1613 (JP)          -27-

judgment[3] regarding compliance with its maintenance obligations under the Agreement.

**V.    DEFENDANT'S COUNTERCLAIM**

Defendant has filed a counterclaim against Plaintiff which was not directly addressed in the parties' summary judgment briefs. Nonetheless, the Court will now consider said counterclaim because it involves the same issues as those of the summary judgment briefs.

In its counterclaim, Defendant alleges that Plaintiff breached the Agreement by failing to appear at the closing and failing to perform its contractual obligations.  Accordingly, Defendant argues that it is entitled to terminate the Agreement and recover the $4,000,000.00 deposit, plus interest, as liquidated damages. Defendant also seeks to recover attorney's fees and other expenses pursuant to Sections 10.3 and 10.4 of the Agreement.

Section 10.1 of the Agreement entitles Defendant to recover the initial deposit and additional deposit as liquidated damages if Plaintiff fails in its obligation to consummate the purchase of the Property.  Having denied Plaintiff's motion for summary judgment and granted Defendant's motion for the same, the Court necessarily finds that Defendant must prevail on its counterclaim.  Given the Court's findings that (1) the repair costs did not exceed $4,000,000.00, (2) Defendant provided the Required Estoppels, and (3) Defendant

---

3.    Although Defendant's motion is titled as a Partial Motion for Summary Judgment, the Court finds that said motion addresses all of the material allegations in Plaintiff's complaint, and therefore is dispositive of this case.

CIVIL NO. 08-1613 (JP)            -28-

complied with its maintenance obligations under the contract,
Plaintiff was obligated to appear at the closing and proceed with the
sale.  Therefore, the Court will enter a separate judgment in favor
of Defendant on its counterclaim, thereby entitling Defendant to
recover the $4,000,000.00 escrow deposit, plus interest, as
liquidated damages, along with attorney's fees and other expenses
pursuant to Sections 10.3 and 10.4 of the Agreement.

**VI.**   **CONCLUSION**

     In conclusion, the Court **DENIES** Plaintiff's motion for summary
judgment, and **GRANTS** Defendant's motion for summary judgment.  The
Court finds in favor of Defendant as to Defendant's counterclaim.
The Court will enter a separate judgment accordingly.

     **IT IS SO ORDERED.**

     In San Juan, Puerto Rico, this 2nd day of July, 2009.


                                   s/Jaime Pieras, Jr.
                                  JAIME PIERAS, JR.
                              U.S. SENIOR DISTRICT JUDGE